Charles H. Joy et al., Appellees, v. Ditto, Incorporated, et al., Defendants. Guy H. Abbott, Appellant.

Gen. No. 36,517.

Opinion filed June 30, 1933.   Opinion slightly modified and rehearing denied July 12, 1933.

KNAPP, BEYE, ALLEN, COCHRAN & CUSHING, for appellant; WILLIAM BEYE, R. C. STEVENSON and WALTER H. VELDE, of counsel.

CATTELL & WALDRON, for appellees; ARCHIBALD CATTELL, CARL A. WALDRON and GEORGE W. DAMMANN, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Complainants, stockholders in Ditto, Incorporated, a corporation, filed their bill against the corporation and certain of its officers and directors, alleging that the corporation, without authority, had unlawfully paid to the individual defendants sums of money in the form of bonuses. The bill prayed for an account-

ing and recovery of the amounts unlawfully paid. The cause was referred to a master, who heard evidence and filed a report finding that bonuses had been "illegally and improperly made" to defendants G. H. Abbott, J. M. Cheney and K. M. Henderson, and recommending that the said payments "should be returned to the treasury of the corporation, for the benefit of all stockholders." The bill prayed for an accounting and restitution from the individuals to the corporation, or, in the alternative, that the individual defendants be required to pay direct to the individual complainants such proportionate share of said reimbursement as the court might find due and owing. Prior to the entry of the decree, the parties stipulated that payment, if any, should be made direct to the individual complainants, and the decree was entered in accordance with the findings and recommendations of the master and the said stipulation. The decree ordered "that Guy H. Abbott pay the complainants $12,675.88, as follows: To Charles H. Joy, $4,008.18, to Mary G. Joy, $3,006.14, to Charles H. Joy, Jr., $2,905.93, to A. L. Joy, $2,755.63; that Joseph M. Cheney pay to the complainants $5,407.56, as follows: To Charles H. Joy, $1,709.90, to Mary G. Joy, $1,282.43, to Charles H. Joy, Jr., $1,239.68, to A. L. Joy, $1,175.55; that K. M. Henderson pay to the complainants $1,969.79, as follows: To Charles H. Joy, $622.86, to Mary G. Joy, $467.14, to Charles H. Joy, Jr., $451.58, to A. L. Joy, $428.21." The decree ordered that the bill be dismissed for want of equity as to all of the defendants save Abbott, Cheney and Henderson. Defendants Abbott, Cheney and Henderson severally appealed but in this court the three appeals (Appellate Court Gen. Nos. 36,517, 36,518 and 36,519) have been consolidated for hearing.

The theory of complainants is that defendants Abbott, Cheney and Henderson were directors and officers

of the corporate defendant Ditto, Incorporated, and as such officers were trustees of the corporate funds, and that they received, without antecedent authority from the board of directors, bonus compensations over and above their fixed salaries, and that such bonuses were therefore illegally paid to them and cannot be retained by them.

Defendants contend: "(a) That all of the compensation, consisting of fixed salary and bonus percentage compensation, paid by Ditto, Incorporated, to G. H. Abbott, J. M. Cheney and K. M. Henderson, was paid to said individuals for non-official services rendered by them to the corporation outside the scope of their duties as officers and directors; (b) that said services were rendered and said compensation was paid under and pursuant to valid and binding contracts of employment entered into between the corporation by its chief executive and said individuals; (c) that said services were rendered under circumstances which precluded the presumption that they were gratuitous; (d) that said total compensation, including fixed salary and bonus, was reasonable; (e) that said employment contracts were entered into by said corporation in accordance with its customary method of doing business; (f) that said employment contracts and the payments of compensation thereunder were ratified and approved by the board of directors and stockholders; (g) that the complainants are estopped, and (h) barred by their laches."

As we have reached the conclusion that the decree should be reversed, we deem it necessary to make a statement of certain salient facts, as we find them: The sole complainants are Charles H. Joy, Mary G. Joy, Charles H. Joy, Jr., and A. L. Joy. No other stockholders appear to have aided the claim made by the complainants and none acquired any benefit through the decree. None of the complainants is related to J. A. Joy, one of the defendants. Complain-

ants own 12.7% of the capital stock of the defendant corporation. From 1920 to October 1, 1928, the principal complainant, C. H. Joy, owned 200 shares of stock and on the last date transferred 60 shares of the same to C. H. Joy, Jr., his son, and 60 shares to Mary G. Joy, his wife. Complainant A. L. Joy, a brother of C. H. Joy, has owned 55 shares of the stock since 1912. The defendant corporation was organized, in 1910, under the laws of the State of West Virginia. At first it "was a very small concern . . . and was practically on the rocks," when defendants J. A. Joy and T. W. Robinson, sometime in 1910, took over the operation of the company, reorganized it, and J. A. Joy was made president. The latter and Robinson "put in some money" in the company and under their careful management it "slowly but steadily grew" into a profitable business. In 1917 the first dividend was paid to the stockholders. The following dividends were paid to the stockholders from 1920 to 1929, both inclusive:

| 1920—16% of par value of Capital Stock. |
| 1921—16% '' '' '' '' '' '' |
| 1922—16% '' '' '' '' '' '' |
| 1923—20% '' '' '' '' '' '' |
| 1924—40% '' '' '' '' '' '' |
| 1925—60% '' '' '' '' '' '' |
| 1926—90% '' '' '' '' '' '' |
| 1927—60% '' '' '' '' '' '' |
| 1928—40% '' '' '' '' '' '' |
| 1929—65% '' '' '' '' '' '' |

The successful operation of the company was due primarily to able management. J. A. Joy acted as president from 1910 to 1928, and thereafter acted as chairman of the board, vested under the by-laws with the full powers "usually vested in the office of president of a corporation." J. A. Joy and Robinson have been directors since 1910. Together they own or control approximately 72% of the stock; the remainder, save that owned by complainants, is owned by 12 per-

sons. In the conduct of the business of the corporation, from its inception, it became a fixed custom for J. A. Joy and Robinson to have general supervision and management of the business and affairs of the company and to determine and act upon all questions of policy relating to said business, at informal meetings and without action by the board of directors. In later years defendant Abbott acted with them. From the beginning J. A. Joy and Robinson, with the knowledge and acquiescence of the other directors, determined the amounts that should be paid to individuals for services rendered to the company, although it is clear that a practice prevailed of not letting one employee know what the others were getting, and this practice prevailed as to fixed salaries as well as bonuses. At the time of the trial Robinson was vice president of the Illinois Steel Company and had charge of the works of the company at South Chicago, Joliet, North Chicago and Milwaukee, which employed approximately 15,000 men. J. A. Joy had been, prior to his connection with the defendant corporation, a successful business man. On October 21, 1924, the by-laws of the defendant corporation were amended so as to provide as follows:

"The Board of Directors shall appoint an Executive Committee consisting of the General Manager of the company and two other members of the Board of Directors. The General Manager shall be Chairman of the Executive Committee. Two members of the Executive Committee shall constitute a quorum. The duties of the Executive Committee shall consist of (1) passing on all loans (2) the purchase of all securities (3) the authorization of all contracts, all at times when the Board of Directors are not in session."

J. A. Joy, Robinson and Abbott were then appointed the members of the said committee and they acted as such until December 31, 1929. Abbott, Cheney and

Henderson, against whom the decree has been entered, commenced service with the corporation in 1910, 1916 and 1919, respectively. Each was employed by J. A. Joy, the president, under an oral contract to perform services as directed by the latter in return for the payment of a stated salary. As none of the three held any official position with the company at the inception of his employment, the services to be then performed were necessarily unofficial in their character. The compensation of each was increased from time to time in accordance with his increasing responsibilities and activities. As officers of the company were advanced, retired, or discontinued connection with the company, Abbott, Cheney and Henderson were elected to various offices. Abbott became an officer in 1912, and a director in 1920. Cheney became an officer in 1920, and a director in 1922. Henderson became an officer in 1923, and a director in January, 1928. Abbott, about the end of 1922, demanded an increase in salary as general manager of the company, and J. A. Joy and Robinson, after giving full consideration to the question, came to the conclusion that instead of giving Abbott a raise in salary it would be better to "grant him an increase in the shape of extra compensation by means of a bonus, dependent, of course, upon his delivering; in other words, making profits," so that "before he could receive the bonus he would have to produce," and it was agreed that Abbott, in addition to his fixed salary, should be given "a percentage of the profits" in the shape of a bonus. J. A. Joy then authorized a bonus compensation to be paid Abbott for the years 1921 and 1922. It further appears that at the end of every year a question arose as to the compensation to be paid to the heads of departments, and in 1922 J. A. Joy, Robinson and Abbott, after numerous conferences upon the subject, adopted a plan of compensation for the heads of the departments under

which each head was to receive a minimum fixed salary and in addition a per cent of the net profits of the business. Because of the growth of the business and the increasing worth and responsibilities of the heads of the departments, and their continual demands for higher salaries, it was concluded that such plan of compensation was advisable; that it was preferable to salary increases because it avoided an increase in fixed liabilities and created in the department heads an incentive for economy in operation, thereby increasing the profits. Robinson testified: ''As to the manner in which the compensation was paid to the several employees of the company, I might say that I was the originator of the bonus plan that is in effect, . . . I think since 1922, . . . I have always been a great believer in the question of bonus as a stimulation, an incentive. In other words, I have always been a great believer that in any enterprise a division of profits is the proper method rather than fixed salaries, and I presented this question of bonus plan to Mr. J. A. Joy. I had some difficulty in selling Mr. J. A. Joy the idea, but finally he agreed that a bonus plan as I had outlined would be a valuable thing.'' At a meeting in January, 1923, Robinson, at the direction of the president, J. A. Joy, explained the plan to the department heads, and Abbott then notified each one separately of the salary and the per cent of the net profits he was to receive under the plan, which applied to six department heads, including Abbott, Cheney and Henderson. Only two of the six were directors, and three held no official positions with the company. Some of the department heads were not in favor of the plan because it limited the amount of the fixed salary, but all finally accepted it and thereafter performed services under the plan. In December, 1927, the plan was extended to include three additional department heads, none of whom was a director or officer. In the same year an

additional bonus of $1,000 was paid to 11 employees, only three of whom were participants in the other bonus plan. This last bonus was authorized by the executive committee for the reason that a number of the 11 employees had been approached by rival companies and it was concluded that it would be exceedingly harmful to the business of the company to have its excellent organization disrupted. Robinson testified that this additional bonus was paid ''to keep up the morale of the organization.'' No action was ever taken by the board of directors in reference to this payment of compensation. With the exception of resolutions relating to the Christmas bonuses, which are hereafter referred to, no resolution was ever passed by the board of directors in reference to payment of compensation to anyone connected with the company for services rendered to it with the exception that the board did pass a resolution pertaining to the compensation of J. A. Joy for the performance of his services as president and chairman of the board of directors. It is clear that J. A. Joy and Robinson handled all such matters, and their action in regard to the same was acquiesced in by the directors.

We are satisfied, from the evidence, that the amount of total compensation, including fixed salary and bonus percentage compensation paid Abbott, Cheney and Henderson, was paid solely for the rendition of services that pertained to the business or commercial activities of the company and that were outside the scope of their official duties, and that such services were accepted by the corporation upon the understanding that the total compensation was to be paid, and the undisputed evidence shows that no more was paid than the reasonable value of the services that were rendered. We are further satisfied that all of the directors of the company, including the complainant C. H. Joy, knew that each of the department heads of the

company was being paid for his services by a fixed salary and a bonus percentage compensation. C. H. Joy, the principal complainant, was a director and stockholder of the company from the time it was reorganized, in 1910, until January, 1930. He seems to have been present at practically all of the meetings of the directors and stockholders. He was present at all meetings of directors from 1920 to 1929, at which resolutions as to the payments of the Christmas bonus to employees were passed, and the record shows that he always voted in favor of such resolutions. Each of these resolutions specifically provided that the Christmas bonus was for employees *"not now receiving other bonus or commission."* He was present at all annual meetings of stockholders from 1921 to 1929, inclusive, and at each voted in favor of a resolution ratifying, approving and confirming all of the acts of the officers and directors of the company for the preceding year. Abbott and Robinson testified that at a meeting of the directors in December, 1927, Robinson, at C. H. Joy's request, explained the plan of the bonus compensation, under which the department heads had been paid since 1923, and stated that they were extending the plan so as to take in three additional department heads. They also testified that J. A. Joy was not present at that meeting. Complainants' witness Flanigan testified that bonus compensation was not discussed at that meeting, but when his entire testimony is considered, it seems plain to us that he did not successfully refute the testimony of Robinson and Abbott. It appears that Flanigan was discharged from the employ of the defendant corporation in 1928 and that he then became president of a competitor of that corporation and was president of the competitor at the time that he testified. Robinson also testified that the bonus plan was discussed at various meetings of the directors and that all of the directors knew that the plan was in

effect. It is noteworthy that neither C. H. Joy nor any of the complainants saw fit to testify in the case, and there is force in the contention of defendants that as the bill is based upon the theory that the bonus payments were made without their knowledge, that complainants, especially C. H. Joy, should have testified that they had no knowledge of the bonus payments or the bonus plan, if such were the fact. Abbott had been in the employ of the defendant corporation since 1910. In 1921 and 1922 he was general manager and sales manager. From January, 1923, to January, 1930, he was general sales manager and as such had supervision of the operation of the business and the management of all of the departments. He devoted all of his time to the business of the company, and the uncontradicted evidence shows that he was a very valuable man to it. Cheney entered the employ of the company in 1916 and was sales manager for the Pacific Division during the years 1920 to 1922, inclusive. He then became the general manager of the company and continued in such position until January, 1930. He devoted all of his time to the business of the company and was in charge of all sales activities. In 1922 he had the supervision of 42 salesmen as well as other employees, and at the end of 1929 he was in charge of 125 salesmen, located in 56 branch offices of the company. The company was represented by its sales department in nearly every important country in the world. Its sales volume increased from $1,537,009 in 1923 to $3,036,101 in 1929. Henderson was employed by the company in 1919. In 1923 he was the office manager and also had charge of the purchasing department. In 1928 he became the manager of the roll manufacturing department, and in 1929 he became the manager of the manufacturing department, and the many products of the company were then manufactured under his supervision. He spent all of his time in his departmental duties and had su-

pervision over 150 employees. That Abbott, Cheney and Henderson were able and efficient employees is abundantly proven by the evidence. The net profits of the company increased from $238,449 in 1923 to $612,157 in 1929. Neither J. A. Joy nor Robinson received any of the bonus payments complained of, and as they own 72% of the stock, they, in effect, paid 72% of all moneys paid out in the form of bonuses, and any claim that these two men were guilty of any fraud or wilful misappropriation of the funds of the company in connection with the bonus payments, is without the slightest merit. J. A. Joy stated: "If I could fix a bonus that would be dependent on the prosperity and the business and get their (department heads) more hearty cooperation and better work, I felt it was to the interest of Ditto to use it that way, and it was, too." Robinson testified: "I was not getting any of this money. Why would I advocate spending this money to give it to some other fellow? Simply by interesting the boys, the stockholders, including myself, would get more money, and that is the theory of any bonus plan, and it has been, in my judgment, really during the last seven or eight or nine years, one reason why these boys worked their heads off . . . ." In *Church v. Harnit,* 35 F. (2d) 499, the court, in referring to bonus payments therein involved, and which were in addition to fixed salaries, said (p. 501): "There is nothing illegal or against public policy in such a contract." In *Putnam v. Juvenile Shoe Corp.,* 307 Mo. 74, 90, the court said, in reference to the bonus payments therein involved:

"The practice has become common among large employers and tends to stimulate loyalty, faithfulness, activity and energy in employees and gives them a real interest in the business of the employer beyond the extent of such qualities reasonably to be expected where a definite and unfluctuating compensation is all such employees have the right to anticipate. The

natural tendency of a bonus, the amount of which is contingent upon profits, is to build up that quality known as *esprit de corps*. It tends to produce profits beyond what may otherwise be expected.''

The testimony shows that the defendant corporation would have had to raise the salaries of department heads materially if the bonus plan had not been adopted. That such plan proved of great benefit to the company and its stockholders is evident from the large dividends that have been paid the latter.

Complainants, in their bill, do not seek to recover the amounts of fixed salaries paid Abbott, Cheney and Henderson. They contend, as we understand their argument, that the fixed salary and the bonus payments represent different types of service, and they argue that as Abbott, Cheney and Henderson were drawing substantial fixed annual salaries the bonus must be treated as a mere gratuity; that under the by-laws of the corporation only the board of directors could make a legal contract of employment with the department heads. As we have heretofore stated, it is clear from the evidence that the bonus percentage compensation to the department heads constituted compensation for the same character of services as that for which the fixed salary was paid.

Complainants contend that ''an officer-director, as such cannot legally have compensation without antecedent action of the board of directors,'' and they cite numerous authorities in support of this proposition. It is the law that for official services performed by director-officers of a corporation a precedent by-law or resolution authorizing the payment of compensation is required, but this principle of law has no application to the facts of this case as we find them.

Complainants' major contention is that a corporation cannot pay compensation to directors or director-officers except upon an antecedent resolution of the board of directors or by a by-law provision. While, as

we have heretofore stated, such rule of law applies to compensation paid for the performance of official duties incident to the official position of director or officer, it is also the law that such rule does not apply to compensation paid for services rendered by a director or director-officer outside of the scope of duties imposed upon him by his office.

"This exception, if it may be called such, is now so well established as to be a rule of similar dignity with the general doctrine stated at the beginning of this chapter, and, according to the great weight of authority, if a director or other officer renders services clearly outside of his duty as such, at the request of the corporation or board of directors, with the understanding that they are to be paid for, the law will imply a promise to pay what they are reasonably worth, and in such cases it is not necessary that there be a special agreement to pay, or precedent resolutions, charter provisions, and the like, providing for compensation." (Fletcher Cyclopedia Corporations, Vol. 4, Sec. 2739.)

In *Stevens v. Industrial Com.,* 346 Ill. 495, 498, the court, after stating the rule that directors may not receive compensation for the performance of their duties as directors or officers unless the compensation is authorized by an antecedent by-law or resolution, says:

Such rule "does not apply to a director or officer who has performed necessary services entirely outside the scope of his duties as a director or officer, at the instance of the officers of the corporation having general authority over the affairs of the corporation, under an express promise of payment for such services or under such circumstances as raise an implied promise to pay for them." (Citing cases.)

(See, also, *Pence v. The West Side Hospital of Chicago,* 265 Ill. App. 560; *Cheeney v. L. B. & M. R. W. Co.,* 68 Ill. 570, 575; *Gridley v. L. B. & M. Ry. Co.,* 71

Ill. 200, 204; *Chicago Macaroni Mfg. Co. v. Boggiano,*
202 Ill. 312.) The contracts of employment of Abbott,
Cheney and Henderson were made in Illinois and the
services performed there, and therefore the law of Illi-
nois is determinative of the question of compensation
thereunder. (*Goodin v. Dixie-Portland Cement Co.,*
79 W. Va. 83.) However, the Illinois rule is the same
as the West Virginia rule. (See *Watts v. West Vir-
ginia Southern R. R. Co.,* 48 W. Va. 262.) The Illinois
rule is the same as that followed in the United States
Supreme Court. (See *Fitzgerald & Mallory Construc-
tion Co. v. Fitzgerald,* 137 U. S. 98.) It will be noted
that in the instant case there was the same authoriza-
tion for the bonus payments as there was for the fixed
salary payments, which complainants do not seek to
have returned.

The contention of complainants that under the by-
laws of the company the board of directors were vested
with the exclusive authority to act upon compensation
payments to the department heads of the company, is
without merit. Undoubtedly, the board of directors,
under the by-laws, had the power and authority to em-
ploy and fix the compensation of the department heads,
but such power was not exclusive. Article VI, sec-
tion 2, of the by-laws (in force until 1928) provides:

"The president . . . shall have the general powers
and duties of supervision and management usually
vested in the office of a president of a corporation."

In 1920, Article VI, section 1, of the by-laws, was
amended so as to provide as follows:

"The president or Board of Directors shall have
power to appoint such other officers as may be deemed
necessary, who shall have such authority and shall per-
form such duties as may from time to time be pre-
scribed by the Board. Officers elected by the Board
shall hold office until the next annual meeting of the
Board of Directors, and until their successors are

elected and qualify. All other officers, *agents, and employees* shall hold office during the pleasure of the Board or of *the officer appointing them.*" (Italics ours.)

Article VI, section 2 (in reference to the powers of the chairman of the board), as amended in 1928, provides:

"He shall have the general powers and duties of supervision and management of the business of the Corporation and its officers and agents, usually vested in the office of President of a Corporation, . . ."

It follows that J. A. Joy, president until 1928, and thereafter chairman of the board, as the chief executive officer, had general powers and duties of supervision and management over the business and affairs of the company. The amendment of 1920 expressly recognizes the authority of officers to appoint and remove agents and employees, and there is force in the contention of defendants that this amendment, by implication, at least, gave authority to such officers to fix compensation. We are of the opinion that under the provisions of the by-laws the president had express corporate authority to make contracts of employment, including the terms of compensation. In *Arkadelphia Lumber Co. v. Asman,* 85 Ark. 568, in which the by-law provisions are substantially the same as are here present, the court so holds. It seems to be undisputed that J. A. Joy, together with T. W. Robinson, always handled the business affairs and determined the policies of the company; that J. A. Joy always handled all matters pertaining to employment and the compensation to be paid for the same. Complainants' witness Flanigan, who was a director from January 22, 1919, to August 3, 1928, testified that in all of the directors' meetings that he attended "there was practically nothing pertaining to business discussed. . . . There is nothing that I can recall that was ever dis-

cussed at directors' meetings pertaining to our business, any further than to pass the dividend that had already been decided on by some of the officials somewhere else. At none of those meetings was there any discussion as to the amounts to be paid for the services of any of those connected with Ditto, Incorporated. That is not a recollection. It is a fact. There was no discussion of compensation paid to anybody at any directors' meetings that I attended. That is true of every directors' meeting that I ever attended. . . . The administration of the business was left to Mr. Joy and Mr. Robinson. It was left to them; it was their business. They directed the affairs of the company. . . . I did not care to disrupt any directors' meetings by asking questions as to what Mr. Joy and Mr. Robinson had done. I had complete confidence in both gentlemen, and I did not care to question their actions in any way.'' There is nothing in the record to show that any objection was ever made by any director or stockholder as to the manner of handling the affairs of the corporation by J. A. Joy or Robinson, or by the executive committee. The master, in his report, states: ''There is no authority in law authorizing an executive officer to make employment contracts with other officers or directors.'' In *Chicago Macaroni Mfg. Co. v. Boggiano, supra,* the court says (pp. 317–8):

''While the principle is well established that in order to entitle an officer of a private corporation to receive compensation for the performance of the duties of his office it is necessary such compensation should have been authorized by the board of directors or by the by-laws of the company, it is also the rule that for the performance of duties or services outside of and apart from those imposed upon him by virtue of his office, such officer may, if such extraordinary services were rendered at the request or with the acquiescence of the corporation, recover upon a *quantum meruit*. (*Rock-*

*ford, Rock Island and St. Louis Railroad Co. v. Sage,*
65 Ill. 328; *Cheeney v. Lafayette, Bloomington and
Mississippi Railway Co.,* 68 id. 570; *Gridley v. Lafay-
ette, Bloomington and Mississippi Railway Co.,* 71 id.
200; 21 Am. & Eng. Ency. of Law, — 2d ed. — 909.)''
In *Stevens v. Industrial Com., supra,* the court said
(p. 498):

''It is well established that the directors of a corpo-
ration cannot receive compensation for the perform-
ance of their duty as directors or as officers of the cor-
poration unless compensation is provided for by a by-
law or resolution of the board of directors before the
services are rendered. This rule applies to a director
who is the president, vice-president, secretary or treas-
urer of a corporation, but it does not apply to a di-
rector or officer who has performed necessary services
entirely outside the scope of his duties as a director or
officer, at the instance of the officers of the corporation
having general authority over the affairs of the cor-
poration, under an express promise of payment for
such services or under such circumstances as raise an
implied promise to pay for them. *Rockford, Rock
Island and St. Louis Railroad Co. v. Sage,* 65 Ill. 328;
*Cheeney v. Lafayette, Bloomington and Mississippi
Railway Co.,* 68 id. 570; *Holder v. Lafayette Blooming-
ton and Mississippi Railway Co.,* 71 id. 106; *Chicago
Macaroni Co. v. Boggiano,* 202 id. 312; *Pew v. First
Nat. Bank,* 130 Mass. 391; *Fitzgerald & Mallory Con-
struction Co. v. Fitzgerald,* 137 U. S. 98.'' (See, also,
*Pence v. West Side Hospital of Chicago, supra,*
pp. 562–3.)

Complainants have devoted a considerable portion
of their brief to the contention that the record shows
secrecy and concealment in the matter of the payments
of the bonus compensation and that such alleged con-
duct imports fraud. We would be forced to extend
this opinion to an unwarranted length if we attempted
to analyze and answer the argument of complainants

in reference to this contention. We again reiterate that there is no reasonable foundation for the claim that there was anything fraudulent in the payments of the bonus compensation to Abbott, Cheney and Henderson. The cases cited have no application to the facts of this case. As we have heretofore stated, J. A. Joy and Robinson, as the owners of 72% of the stock, in effect paid 72% of such compensation.

Complainants now admit that C. H. Joy was advised of the bonus plan in December, 1927, and that he did not bring the instant proceedings until 27 months thereafter, and defendants contend that such delay constituted laches and barred his right to relief. In the view that we have taken of this case we do not deem it necessary to pass upon this point. We feel impelled, however, to state that the bill was filed on March 19, 1930, which was about five months after the debacle in the fall of 1929, at which time the great depression started. C. H. Joy did not ask the board of directors to take action in reference to the recovery of the bonus payments in question until January 22, 1930. As we read the record in this case the impression grows that the claim in the instant bill is an aftermath and an afterthought of the great depression.

It appears that at a special meeting of the stockholders on March 24, 1930, all of the compensation that had been paid Abbott, Cheney and Henderson was ratified and approved, and defendants contend that such action of the stockholders is conclusive and binding upon complainants, but we do not deem it necessary to pass upon this contention nor the cases cited in support of it.

Under the facts, as we find them, it would be highly inequitable to require Abbott, Cheney and Henderson to pay to complainants any part of the compensation earned by such defendants for valuable services rendered by them to the corporation over a period of years. The corporation, as well as the complainants,

has been greatly benefited by such services, which, the undisputed evidence shows, materially contributed to the extraordinary profits of thé business during the period in question.

Our conclusion is that the decree as to Abbott, Cheney and Henderson should be reversed, but as the instant appeal (Appellate Court Gen. No. 36,517) is prayed solely by Guy H. Abbott, the order will be that the decree is reversed as to him and the cause remanded with directions to dismiss complainants' bill as to him for want of equity.

*Reversed and remanded with directions.*

SULLIVAN, P. J., and GRIDLEY, J., concur.